UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: December 17, 2015

-----------------------------------------------------------------X
                                               :

DAVID HENRY III,                       :

                                             :

                             Plaintiff,     :            12-cv-6822 (KBF)

                                             :

                    -v-                  :         OPINION &amp; ORDER

                                           :

CAROLYN COLVIN, Acting Commissioner of  :
Social Security,

                                           :

                          Defendant.    :

                                           :

----------------------------------------------------------------- X

KATHERINE B. FORREST, District Judge:

     Plaintiff David Henry III seeks review of the decision by defendant Commissioner of Social Security (the "Commissioner") finding that he was not disabled and not entitled to Supplemental Security Income benefits under Title XVI of the Social Security Act (the "Act").

     Plaintiff filed a claim for disability benefits on May 16, 2008.  (Tr. 97, 658.)[1] The Commissioner denied plaintiff's application, (Tr. 88-96), and plaintiff requested a hearing before an Administrative Law Judge ("ALJ") (Tr. 86.)  The hearing was held on July 1, 2009 before ALJ Newton Greenberg.  (Tr. 889-901.)   On August 10, 2009, ALJ Greenberg found that plaintiff was not disabled under the Act.  (Tr. 655-665.)

     Plaintiff requested that the Appeals Council review ALJ Greenberg's decision.  (Tr. 666.)  On February 10, 2011, the Appeals Council found error, and

---

[1]     Citations to "Tr." refer to pages of the administrative record.

remanded the case to another ALJ.  (Tr. 667-71.)  A second hearing was held on

September 21, 2011 before ALJ Michael Friedman.  (Tr. 855-888.)  On October 14,

2011, ALJ Friedman also found that plaintiff was not disabled under the Act.  (Tr.

16-30.)  Plaintiff again requested review by the Appeals Council, who denied the

request, making the ALJ Friedman's decision the final determination of the

Commissioner.  (Tr. 6-10.)

On September 12, 2012, plaintiff filed this action seeking judicial review of

the ALJ's October 14, 2011 decision.  (ECF No. 1.)  Before the Court are the parties'

cross-motions for judgment on the pleadings.  For the reasons set forth below,

defendant's motion is GRANTED, and plaintiff's motion is DENIED.

I.      FACTUAL BACKGROUND[2]

Plaintiff was born in 1963 and was 44 years old when he applied for SSI.  (Tr.

36.)  He has a ninth grade education and has never worked before.  (Tr. 29, 106,

110.)

A.      Medical Evidence Before the ALJ

1.      Treating Physician Evidence

Plaintiff began treatment at the Psychiatric Department of Bronx-Lebanon

Hospital on March 26, 2008.  (Tr. 344.)  At that time, psychiatrist Dr. Kingsley

Nwokeji diagnosed plaintiff with depressive disorder and rule-out antisocial

---

[2]      The Court recites here only those facts relevant to its review.  A further recitation of
plaintiff's medical history is contained in the Administrative Record.

personality disorder.  Plaintiff's GAF score—a measurement of overall psychological functioning—was 55, which indicated moderate symptoms.[3]  (Tr. 363.)

On his initial psychosocial history form for Dr. Nwokeji, plaintiff reported symptoms of depressed mood, aggressive behavior, disruptive thoughts, decreased appetite, auditory hallucinations, crying spells, irritability, panic attacks, decreased sleep, paranoia, and social phobias.  (Tr. 357.)  Plaintiff had a physically abusive father.  (Tr. 359.)  As a student, plaintiff attended special education classes.  (Tr. 360.)  He has a ninth grade education, after which he "started using drugs / went to jail."  (Tr. 360.)  Although plaintiff reported a history of drug use, he was clean at the time of Dr. Nwokeji's evaluation.  (Tr. 358.)

On April 3, 2008, Dr. Nwokeji completed a Treating Physician's Wellness Plan Report.  (Tr. 340-341.)  Dr. Nwokeji again diagnosed plaintiff with depression, as well as schizoaffective disorder.  (Tr. 340.)  Dr. Nwokeji noted that plaintiff had a depressed mood, constricted affect, low self-esteem, feelings of hopelessness, and vague auditory hallucinations.  (Tr. 340.)  He stated that plaintiff has recurrent depressive episodes and that plaintiff was unable to work for at least 12 months. (Tr. 341.)

---

[3]     The GAF is measured on a scale of 1 to 100.  A GAF in the range of 51 to 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) [or] moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  Zabala v. Astrue, 595 F.3d 402, 405 (2d Cir. 2010) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV"), at 34 (4th ed. 2000)).  A GAF in the range of 61 to 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  Id.  (DSM-IV at 34).

Almost a full year later, on February 9, 2009, psychiatrist Dr. Miriam A.
Ewaskio, who became plaintiff's treating psychiatrist, diagnosed him with
depression and schizo-affective disorder.  (Tr. 71.)  Plaintiff, whose wife had recently
passed away after a long illness, reported symptoms that included depressed mood,
constricted affect, low self-esteem, hopelessness, and vague auditory hallucinations.
(Tr. 71-72.)  Dr. Ewaskio stated that plaintiff was irritable and had social phobia
and concentration problems.  (Tr. 72.)  He had a good ability to understand,
remember, and carry out simple instructions and a fair ability with detailed
instructions, maintaining personal appearance, behaving in an emotionally stable
manner, and demonstrating reliability.  However, he had poor to no ability in
relating predictably in social situations.  (Tr. 72.)  Dr. Ewaskio also found that
plaintiff was compliant with and responding to treatment and would be able to
manage his benefits.  (Tr. 71, 73.)

Dr. Ewaskio completed another report on April 16, 2009.  (Tr. 446-47.)  She
noted that plaintiff continued to suffer from paranoia, general mistrust, mood
lability, angers issues, and insomnia.  (Tr. 446.)  He also exhibited symptoms of
posttraumatic stress disorder ("PTSD") after his wife's death.  (Tr. 446.)  Plaintiff
was compliant with treatment.  (Tr. 446.)  Dr. Ewaskio opined that Plaintiff was
unable to work for at least twelve months due to his symptoms.  (Tr. 447.)

In a June 2009 psychiatric impairment questionnaire, Dr. Ewaskio stated
that plaintiff's diagnoses were PTSD, episodic mood disorder, and rule out bipolar
disorder; his GAF was 55.  (Tr. 456.)  Dr. Ewaskio stated that plaintiff was stable,

4

but his prognosis was poor due to problems managing with stress.  (Tr. 456.)  Her clinical findings for plaintiff included poor memory, personality change, mood disturbance, emotional lability, paranoia, feelings of guilt or worthlessness, difficulty thinking or concentrating, intrusive recollections or a traumatic experience, persistent irrational fears, and hostility and irritability.  (Tr. 457.) Plaintiff had flashbacks, severe interpersonal difficulties, very low frustration tolerance, and exaggerated sensitivity to perceived criticism.  (Tr. 457.)   His medications included Depakote, Abilify, Ambien, Remeron, and Lexapro.  (Tr. 461.)

Dr. Ewaskio stated on the questionnaire that plaintiff moderately limited in the ability to remember locations and work-like procedures and to respond appropriately to changes in the work setting.  He was markedly limited in the ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance, sustain an ordinary routine without supervision, to work in coordination with or proximity to others without being distracted, to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of resting periods, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 459-61.)

However, plaintiff had mild limitations in understanding, remembering, and carrying out one or two step instructions, make simple work-related decisions, maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness, and set realistic goals or make plans independently. Dr. Ewaskio also stated there was no evidence of any limitation in the ability to ask simple questions or request assistance, to be aware of normal hazards and take appropriate precautions, or to travel to unfamiliar places or use public transportation. (Tr. 459-61.) She concluded that Plaintiff could not even perform low stress jobs and that he would be absent from work more than three times per month because of his conditions. (Tr. 462-63.) Dr. Ewaskio's May 20, 2010 assessment reiterated substantially similar opinions on plaintiff's limitations as the above June 2009 report. (Tr. 675-82.)

On December 8, 2010, Dr. Ewaskio's treatment notes stated that Plaintiff's GAF was 55 and his treatment strengths included strong religious beliefs, insight, no substance abuse, good communication skills, literacy, and lack of violence/aggression. (Tr. 563.) At this time, his diagnosis was episodic mood disorder. (Tr. 563.)

On January 3, 2011, Dr. Ewaskio noted that plaintiff was "stable despite stressors re: son," who had been acting out, and that plaintiff's symptoms had diminished. (Tr. 568.)

On March 14, 2011, Dr. Ewaskio stated that Plaintiff continued to have severe difficulty functioning within the limits of the clinic because of his low

6

frustration tolerance.  (Tr. 782.)  She noted that "[t]his is a supportive, lower-stress environment than any work setting would be where interpersonal conflicts + stress levels are much higher."  (Tr. 782.)

On May 4, 2011, Dr. Ewaskio completed a wellness report, indicating that Plaintiff could not work for at least 12 months.  (Tr. 502.)  Dr. Ewaskio noted that Plaintiff had social phobia, serious mood swings, and impaired concentration and memory.  (Tr. 502).

On June 13, 2011, Dr. Ewaskio again stated that Plaintiff's symptoms had diminished and stabilized.  (Tr. 589-90.)  However, in a July 7, 2011 letter, Dr. Ewaskio stated that her assessments in the May 20, 2010 psychiatric impairment questionnaire remained "accurate and valid."  (Tr. 825.)

On October 12, 2011, plaintiff told Dr. Ewaskio that his 17-year old son may have fathered a child.  (Tr. 610.)  Plaintiff was depressed and tearful, but Dr. Ewaskio's remaining findings were unchanged from previous examinations.  (Tr. 610).  Dr. Ewaskio noted no significant changes at visits through February 6, 2012. (Tr. 599-627.)

### 2.   Evidence from Therapist / Social Worker

Plaintiff also received frequent treatment from Robert Keeler, a licensed master social worker ("LMSW").  During numerous therapy sessions from 2009 to 2012, Keeler consistently noted that plaintiff was calm and clinically stable, even though his levels of stress and symptoms varied.  Plaintiff never expressed suicidal

or violent ideation,[4] and was always cooperative and pleasant.  Keeler noted repeatedly that plaintiff had strengths such as strong family and social supports, strong religious and spiritual beliefs and guidance, motivation for treatment, and capability for insight.

On February 9, 2009, Keeler completed a psychiatric assessment for plaintiff's application for Social Security benefits.  (Tr. 74-75.)  Plaintiff's psychiatric diagnoses were depressive disorder not otherwise specified, rule-out major depressive disorder, and rule-out antisocial personality disorder.  His GAF was 55-60.  (Tr. 74.)  His symptoms included paranoid ideations, social phobia, anger issues, irritability, anxiety, and depressed mood.  (Tr. 74.)  Plaintiff was well-groomed, guarded, had appropriate affect, and depressed mood.  (Tr. 74.)  His speech was coherent and his psychomotor activity was normal.  (Tr. 74.)  Plaintiff denied hallucinations and other perceptual disturbances.  (Tr. 74.)  Plaintiff denied suicidal or homicidal ideation, and he had adequate concentration, attention, judgment, insight, and impulse control.  (Tr. 74.)

Keeler also stated that Plaintiff's prognosis was fair and that he needed twelve months of sustained treatment.  (Tr. 75.)  In addition, Keeler noted that plaintiff sporadically attended monthly treatment sessions since initial admission in March 2008.  (Tr. 74-75.)  At one point, plaintiff was absent for about ninety days. (Tr. 74).

---

[4]    Plaintiff was charged with assault in 1979 (as a teenager) and in 2007.  He has had no further arrests since 2007.  (Tr. 625.)

Plaintiff saw Keeler eight more times from April to December 2009, but missed appointments between June and October entirely.  Keeler's notes from these visits noted that plaintiff's GAF ranged between 55 and 65.  He always noted that plaintiff was calm and clinically stable; however, plaintiff frequently reported stress over his son's behavioral issues and paranoia of the police.  Keeler frequently emphasized the importance of attending therapy sessions regularly to plaintiff.  (Tr. 687-92, 697-98, 701-04, 707-09.)

Keeler's treatments notes from January 11, 2010 through August 23, 2010 were also consistent with the 2009 notes.  They revealed plaintiff's complaints of depression, irritability, and family stressors.  (Tr. 709-29.)  Plaintiff remained clinically stable, with GAF scores of 55 to 60.  (Tr. 710-29.)  Plaintiff next saw Keeler on December 23, 2010, and the evaluation results were largely similar to prior visits.  (Tr. 565-66.)

On January 18, 2011, plaintiff reported to Keeler that he was "feeling worse than previously, attributing this to stress from his girlfriend."  (Tr. 570.)  However, plaintiff remained calm and clinically stable, and reported adherence to his medication regiment and lack of suicidal or violent ideation.  (Tr. 570.)

Plaintiff missed appointments on January 27, 2011 and February 9, 2011. (Tr. 572.)  On February 24, 2011, plaintiff reported feeling worse since his last visit, and an aggravated and stressed mood.  (Tr. 573.)  He reported that his medication had made him "made [him] afraid to walk, to take the next step" over the past two days.  Keeler recommended that plaintiff see a primary care physician, to undergo a

physical examination, and to discuss symptoms with Dr. Ewaskio.  (Tr. 573.)  Keeler also noted that plaintiff's "psychiatric symptoms have diminished and stabilized," but nevertheless needed to continue on medication.  (Tr. 574.)

On March 16, 2011, plaintiff that he was still feeling "a little worse" than at the last visit, and that he had been missing his deceased wife and having crying spells, difficulty sleeping, and concentration problems.  (Tr. 576-77.)  However, he also stated that the medication was helping him.  Keeler again noted that plaintiff was calm and clinically stable, and his psychiatric symptoms have "diminished and stabilized," but that plaintiff needed to maintain his medication regimen.  (Tr. 576.) He discussed the treatment plan with plaintiff."

Progress notes from March 31, 2011 indicate that plaintiff complained chiefly of physical pain and two panic episodes.  (Tr. 579-80.)  Keeler advised that plaintiff contact a physician for his pain, and discussed stress triggers and cognitive therapy. (Tr. 579.)

On April 19, 2011, plaintiff again reported feeling worse, with low energy and irritability.  (Tr. 582.)  He discussed some paranoid thoughts, but was calm and clinically stable.  (Tr. 582-83.)

By the next two visits, on May 3, 2011 and June 1, 2011, plaintiff reported feeling better and calmer, and that he slept better and was sad less.  (Tr. 584, 587.) Plaintiff spoke tearfully of his late wife, (Tr. 584), and continuing conflict with his son, (Tr. 587.)  Keeler assessed him as calm and clinically stable.  (Tr. 584, 587.)

Plaintiff saw Keeler twice more in June 2011.  At the latter, June 23, 2011 visit, Keeler noted that Plaintiff's GAF was 58 and his primary diagnosis was episodic mood disorder.  (Tr. 591.)  Plaintiff expressed a general desire to get better. (Tr. 52.)  Plaintiff was accompanied by his girlfriend, with whom he recently had a daughter.  The two discussed with Keeler plaintiff's tendency to "keep his feelings and deepest thoughts bottled up inside, his fear of intimacy, and his radical suspicion / paranoia of others."  (Tr. 593.)  Keeler discussed the treatment plan with both plaintiff and his girlfriend.  (Tr. 592.)

Plaintiff did not attend his July 11, 2011 appointment.  (Tr. 595.)  On August 3, 2011, plaintiff presented as calm, pleasant, and clinically stable, but expressed concerns about finances and family relationships.  (Tr. 596.)  Plaintiff reported that he has resumed attending mosque and that he has been talking to an imam for spiritual advice.  Keeler encouraged the development of sources of spiritual guidance and discussed anxiety-alleviating techniques.  (Tr. 596.)  By the next visit on August 17, 2011, plaintiff reported spending time with his girlfriend and daughter, but also that he had memory and concentration problems when reading books.  He also discussed his fears about getting a fatty tumor removed after his wife died of cancer.  (Tr. 599.)

Visit notes from September to December 2011 did not reveal any new developments; plaintiff was calm, clinically stable, and continued to grieve for his wife and experience stress with his son—including his son's girlfriend's pregnancy. (Tr. 604, 608, 612-13.)  The record also contains treatment records from Keeler that

11

post-date the ALJ's decision and were submitted to the Appeals Council. These records contain findings substantially similar to the records submitted during the period at issue.  (See Tr. 612-19, 623-24, 646-54).

3.    Consultative Examinations

On June 12, 2008, consulting psychologist Dr. Michael Alexander examined plaintiff.  Plaintiff reported no psychiatric hospitalizations, but said he saw mental health professionals as a child and during incarceration[5] and had been seeing a psychiatrist on an outpatient basis once a month since November 2007.  (Tr. 411.) Plaintiff stated that medication helped his depression.  (Tr. 411.)  Plaintiff stated that he had used drugs since he was eleven, but had been clean since February 2008. (Tr. 412.)

After performing a mental status examination, Dr. Alexander diagnosed plaintiff with dysthymic disorder (chronic less severe depression) with antisocial features, and substance dependence in remission.  (Tr. 413.)  Dr. Alexander opined that as a result of his psychiatric disorder, plaintiff "would have difficulty in an employment situation."  (Tr. 413.)

Also on June 12, 2008, plaintiff saw Dr. Catherine Pelczar-Wissner, an internal medicine consultative examiner.  He complained of depression, stress, anxiety, headaches, asthma, pain on the left side under his armpit, finger numbness, right leg limp, low back pain, and stiff back.  (Tr. 406.)  Dr. Pelcazar-

---

[5]    Plaintiff was incarcerated for armed robbery for seven years and incarcerated again for eight months for robbery.  (Tr. 412.)

Wissner concluded that Plaintiff had a marked restriction for heavy lifting and carrying due to low back pain.  (Tr. 410.)

On July 17, 2008, Dr. R. Altmansberger, a state agency medical consultant, completed another psychiatric review.  (Tr. 425-38.)  Dr. Altmansberger found that plaintiff had dysthymic disorder and antisocial personality traits.  However, he assessed only a mild restriction in activities of daily living and moderate restrictions in maintaining social functioning and maintaining concentration, persistence, and pace.  (Tr. 435.)

On the same day, Dr. Altmansberger completed a Mental Residual Functional Capacity Assessment.  (Tr. 421-23.)  He opined that plaintiff had average intelligence, cooperative behavior, intact memory, concentration, and attention, and adequate social skills.  However, plaintiff did not like being around others.  In remission for drug abuse, plaintiff attended alcoholics anonymous and narcotics anonymous meetings.  (Tr. 423.)  Based on his examination, Dr. Altmansberger found that plaintiff "can perform simple jobs."  (Tr. 423.)

    4.    <u>FEGS report</u>[6]

A March 25, 2009 biopsychosocial history note from a FEGS social worker indicated that Plaintiff had not worked since age 15, and has six children.  (Tr. 464-85.)  Plaintiff reported a history of mental illness since his arrest in February 2007. (Tr. 473.)  Plaintiff reported auditory hallucinations of deceased relatives, fatigue,

---

[6]    FEGS WeCARE was a New York nonprofit organization that assisted public assistance applicants and recipients with clinical barriers to employment, including medical, mental health and substance abuse conditions, to obtain employment or federal disability benefits. <u>See</u> http:/www.fegs.org/press.html

and problems with sleep, appetite, and concentration.  (Tr. 473-74.)  Plaintiff was able to wash dishes, wash clothes, sweep, mop, make beds, cook, shop, read, get dressed, use the toilet, and independently groom.  (Tr. 475.)  Plaintiff liked to play chess.  (Tr. 475.)  FEGS notes from February to October 2011 reported substantially similar findings.  (Tr. 503-50.)

B.   Non-Medical Evidence Before the ALJ

1.   Plaintiff's Hearing Testimony

Plaintiff testified at the 2011 administrative hearing that he lived with his 17-year-old son.  (Tr. 858.)  He had pain in his lower back that radiated to this right leg; he took over-the-counter medicine for this pain and attended physical therapy.  (Tr. 858-59.)  Plaintiff had asthma and used an albuterol inhaler.  (Tr. 859.)  Plaintiff could stand for ten minutes and sit for one minute.  (Tr. 861-62.)  He is also capable of lifting five to ten pounds.  (Tr. 862).

Plaintiff also reported various psychological symptoms.  He stated that he was stressed out, depressed, easily angered, and did not like to be around others, a symptom that he believed stemmed from years of incarceration.  (Tr. 859-60.)  He reported difficulty concentrating, focusing, and remembering things.  (Tr. 861.)

Since his wife passed away, plaintiff had lost interest in most activities.  (Tr. 863.)  During the day, he watched television and "sit there and stare and think of my wife."  (Tr. 862-63.)  He cried almost every day.  (Tr. 867.)  Plaintiff would go grocery shopping with his son, but only cooked food in the microwave.  (Tr. 862.)

14

Plaintiff helped clean his apartment.  (Tr. 862.)  He went to the mosque every day and goes to church on Sundays.  (Tr. 897).

Plaintiff stated that he has paranoia around others; his son is his only friend. (Tr. 895, 898.)  When plaintiff has to take the subway, such as when he traveled to the hearing, he rides between the cars to avoid "shoving and pushing."  (Tr. 862, 867.)  He walks to his clinic visits, which are only two blocks from his apartment. (Tr. 865.)

Plaintiff also reported auditory hallucinations of deceased family members. (Tr. 868.)  His medications helped with the voices, but he still heard them at a lower volume.  (Tr. 869).

Plaintiff had no psychiatric hospitalizations, but was in a special isolated housing unit while incarcerated.  (Tr. 860.)  Plaintiff saw his therapist once or twice per week and his psychiatrist up to three times per month for one hour each time. (Tr. 860-61, 869.)  His medications include Lorazepam for panic attacks, which occur at times when he encounters crowds.  (Tr. 870.)  Plaintiff had problems sleeping and occasionally took Ambien.  (Tr. 870-71.)  According to plaintiff, the psychiatric treatment helps.  (Tr. 861.)

      2.   <u>Vocational Expert Testimony</u>

The ALJ enlisted the assistance of vocational expert ("VE") Victor Albarishi at the hearing.  The ALJ asked the VE to consider and individual who was capable of performing sedentary work that was low stress and simple, involving minimal contact with coworkers and the public.  (Tr. 879.)  The VE stated that such an

individual could perform unskilled sedentary work as an envelope addresser (6,500 jobs regionally and 139,516 jobs nationally), document preparer (122,430 jobs regionally and 3.1 million nationally), and pneumatic tube operator (5,202 jobs regionally and 122,304 jobs nationally).  (Tr. 879-80 (referring to U.S. Department of Labor's Dictionary of Occupational Titles (4th ed. rev. 1991) Codes 209.587-010 (SVP 24), 249.587-018 (SVP 2), and 239.687-014 (SVP2)).)[7]

However, the VE also testified that an individual with these same characteristics, but who also had additional marked limitations in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance, could not perform any work.  (Tr. 884-85.)  Moreover, an individual with additional marked limitations in the ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods could also not perform any work.  (Tr. 885-886.)  Finally, an individual with additional marked limitations in the ability to accept instructions and respond appropriately to criticisms from supervisors could not work.  (Tr. 886.)

---

[7]    The Court is concerned about the fact that the Dictionary of Occupational Titles was last published twenty-five years ago, see Browning v. Colvin, 766 F.3d 702, 709 (7th Cir. 2014), and about the actual availability of some of the proposed jobs, given, for example, that the pneumatic tube mail system in New York City became obsolete over half a century ago.  However, the Dictionary is nevertheless an accepted basis for vocational opinion according to the Commissioner's rules.  See Brault v. Comm'r Soc. Sec. Admin, 683 F.3d 443, 446 (2d Cir. 2012); Massimo v. Shalala, 927 F. Supp. 139, 145 (S.D.N.Y. 1996).

C.    Procedural History

1.    2009 ALJ decision

Plaintiff applied for benefits on May 15, 2008, alleging that his disability

began on February 4, 2007.  (Tr. 658.)  After an initial denial of his application on

July 17, 2008, plaintiff requested a hearing and testified before ALJ Greenberg on

July 1, 2009.  (Tr. 658, 889.)  On August 10, 2009, ALJ Greenberg denied plaintiff's

application, finding that plaintiff did not have an impairment or combination of

impairments that meets or medically equals one of the impairments listed in 20

C.F.R. Part 404, Subpart P, Appendix I, that he had residual functional capacity to

perform simple sedentary work in an environment involving little contact with the

general public, and that there exist jobs in significant numbers in the national

economy that plaintiff can perform.  (Tr. 660-65.)  In making these determinations,

ALJ Greenberg gave the opinion of plaintiff's treating physician Dr. Ewaskio partial

weight on the basis that it "was not supported by specific examination findings

noted during her treatment."  (Tr. 663.)  He also did not use a vocational expert.

Plaintiff appealed to the Appeals Council, who determined on November 6,

2009 that ALJ Greenberg had erred by failing to properly evaluate Dr. Ewaskio's

opinion as plaintiff's treating physician and by failing to use the testimony of a

vocational expert when plaintiff suffers from a non-exertional limitation.  The

Appeals Council remanded the case to another ALJ, requiring a re-evaluation of the

severity of plaintiff's impairments from step two of the sequential social security

evaluation process, to specifically evaluate the plaintiff's maximum RFC by considering Dr. Ewaskio's opinion, and to enlist a vocational expert.  (Tr. 669-671.)

>            2.      2011 ALJ decision

On remand, plaintiff appeared at another hearing before ALJ Friedman on September 21, 2011, who called the vocational expert to testify.  (Tr. 855-88.)  On October 14, 2011, ALJ Friedman found that plaintiff was not disabled under the Act.  (Tr. 19-30.)

The ALJ conducted the five-step sequential evaluation process, taking into account the Appeals Council's instructions to re-evaluate plaintiff's impairments beginning with step two of the five-step process.  (See Tr. 23, 26, 670.)  At step two, the ALJ found that plaintiff had both severe physical and mental impairments.  (Tr. 21.)  At step three, however, the ALJ found that no impairment or combination of impairments that met or medically equaled the severity of any impairment listed in Appendix 1.  (Tr. 21-22.)  In particular, he found that although plaintiff had moderate difficulties in social functioning and in concentration, persistence, and pace, his mental impairments did not meet the regulation's requirements:  that they cause at least two "marked" limitations, or one "marked limitation" plus repeated episodes of decompensation of extended duration.

At step four, ALJ determined plaintiff's RFC and found that plaintiff could perform sedentary work, limited to low-stress, simple tasks involving only minimal contact with coworkers and the public."  (Tr. 22.)  In making this determination, the ALJ evaluated the record evidence, including those from treating physician Dr.

Ewaskio, treating therapist Keeler, consultative experts, FEGS notes, and

plaintiff's 2011 hearing testimony.  (Tr. 22-29.)  The ALJ also found that plaintiff

had no past relevant work.  At step five, the ALJ concluded that based on the

Medical-Vocational Guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2

and the testimony of the vocational expert, plaintiff was able to perform jobs

existing in significant numbers in the national economy.  (Tr. 29-30.)  Accordingly,

the ALJ concluded that plaintiff was not disabled.  (Tr. 30.)

II.   APPLICABLE LEGAL PRINCIPLES

A.   Judgment on the Pleadings

"After the pleadings are closed—but early enough not to delay trial—a party

may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  "The same

standard applicable to Fed. R. Civ. P. 12(b)(6) motions to dismiss applies to Fed. R.

Civ. P. 12(c) motions for judgment on the pleadings."  Bank of N.Y. v. First

Millennium, Inc., 607 F.3d 905, 922 (2d Cir. 2010) (citation omitted).  Therefore,

"[t]o survive a Rule 12(c) motion, the complaint 'must contain sufficient factual

matter, accepted as true, to state a claim to relief that is plausible on its face.'"  Id.

(quoting Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir. 2010)).

B.   The Disability Standard

The Commissioner will find a claimant disabled under the Act if he or she

demonstrates an "inability to engage in any substantial gainful activity by reason of

any medically determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to last for a continuous

19

period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The claimant's

impairment must be "of such severity that he is not only unable to do his previous

work but cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work which exists in the national economy."

Id. § 423(d)(2)(A).  The disability must be "demonstrable by medically acceptable

clinical and laboratory diagnostic techniques."  Id. § 423(d)(3).

The Commissioner uses a five-step process when making disability

determinations.  See 20 C.F.R. §§ 404.1520, 416.920.  The Second Circuit has

described the process as follows:

> First, the Commissioner considers whether the claimant is currently
> engaged in substantial gainful activity.  Where the claimant is not, the
> Commissioner next considers whether the claimant has a "severe
> impairment" that significantly limits her physical or mental ability to
> do basic work activities.  If the claimant suffers such an impairment,
> the third inquiry is whether, based solely on medical evidence, the
> claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt.
> P, app. 1 ["Appendix 1"].  If the claimant has a listed impairment, the
> Commissioner will consider the claimant disabled without considering
> vocational factors such as age, education, and work experience; the
> Commissioner presumes that a claimant who is afflicted with a listed
> impairment is unable to perform substantial gainful activity.
> Assuming the claimant does not have a listed impairment, the fourth
> inquiry is whether, despite the claimant's severe impairment, she has
> the residual functional capacity ["RFC"] to perform her past work.
> Finally, if the claimant is unable to perform her past work, the burden
> then shifts to the Commissioner to determine whether there is other
> work which the claimant could perform.

Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999) (citation and footnote omitted); see

also Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003); DeChirico v. Callahan, 134

F.3d 1177, 1179-80 (2d Cir. 1998).  The claimant bears the burden of proof in steps

one through four, while the Commissioner bears the burden in the final step.

Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012).

    C.    Review of the ALJ's Judgment

The Commissioner and ALJ's decisions are subject to limited judicial review. The Court may only consider whether the ALJ applied the correct legal standard and whether his or her findings of fact are supported by substantial evidence. When these two conditions are met, the Commissioner's decision is final.  See Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998) ("We set aside the ALJ's decision only where it is based upon legal error or is not supported by substantial evidence." (citation omitted)); 42 U.S.C. § 405(g).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)) (internal quotation marks omitted).  If the Commissioner and ALJ's findings as to any fact are supported by substantial evidence, then those findings are conclusive.  42 U.S.C. § 405(g); Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995).  When the Appeals Council denies review after considering new evidence, the court reviews the entire administrative record— which includes the new evidence—and determines whether there is substantial evidence to support the decision.  Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)

While the Court must consider the record as a whole in making this determination, it is not for this Court to decide de novo whether the plaintiff is disabled.  See Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Beauvoir v. Chater, 104 F.3d 1432, 1433 (2d Cir. 1997); Veino, 312 F.3d at 586 ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner.").  The Court must uphold the Commissioner's decision upon a finding of substantial evidence, even when contrary evidence exists.  See Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder." (citation omitted)); see also DeChirico, 134 F.3d at 1182-83 (affirming an ALJ decision where substantial evidence supported both sides).

Finally, it is the function of the Commissioner, not the Court, "to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant."  Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (quoting Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983)) (internal quotation mark omitted); see also Gernavage v. Shalala, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995) ("Deference should be accorded the ALJ's [credibility] determination because he heard plaintiff's testimony and observed his demeanor." (citations omitted)).  An ALJ's decision on credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and

to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  Soc. Sec. Ruling 96–7p, 61 Fed. Reg. 34484.

       D.    <u>The Treating Physician Rule</u>

"[T]he treating physician rule generally requires deference to the medical opinion of a claimant's treating physician," although an ALJ need not afford controlling weight to a treating physician's opinion that is "not consistent with other substantial evidence in the record, such as the opinions of other medical experts." <u>Halloran v. Barnhart</u>, 362 F.3d 28, 32 (2d Cir. 2004) (citations omitted); <u>see also</u> <u>Burgess</u>, 537 F.3d at 128.  An ALJ who does not accord controlling weight to the medical opinion of a treating physician must consider various factors, including "(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; [and] (iv) whether the opinion is from a specialist."  <u>Halloran</u>, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)). After considering these factors, the ALJ must "comprehensively set forth reasons for the weight assigned to a treating physician's opinion."  <u>Id.</u> at 33.

Although the ALJ will consider a treating source's opinion as to whether a claimant is disabled or able to work, the final responsibility for deciding those issues is reserved to the Commissioner, and the treating source's opinion on them is not given "any special significance."  20 C.F.R. § 404.1527(d)(e); <u>see also</u> Soc. Sec. Ruling 96-5p, 1996 WL 374183, at *3 (July 2, 1996); <u>Snell v. Apfel</u>, 177 F.3d 128,

133 (2d Cir. 1999).  When a finding is reserved to the Commissioner, "the Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability.  A treating physician's statement that the claimant is disabled cannot itself be determinative."  Snell, 177 F.3d at 133.  It is the ALJ's duty, as the trier of fact, to resolve conflicting medical evidence.  See Richardson, 402 U.S. at 399.

     E.     <u>The ALJ's Duty to Develop the Record</u>

     Although "[t]he claimant has the general burden of proving that he or she has a disability within the meaning of the Act," "the ALJ generally has an affirmative obligation to develop the administrative record."  Burgess, 537 F.3d at 128 (citations and internal quotation marks omitted).  SSA regulations require an ALJ to "inquire fully into the matters at issue and . . . receive in evidence the testimony of witnesses and any documents which are relevant and material to such matters."  Id.  (quoting 20 C.F.R. § 702.338).  "In light of the ALJ's affirmative duty to develop the administrative record, 'an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.'"  Id. at 129 (citation omitted); Calzada v. Astrue, 753 F. Supp. 2d 250, 277 (S.D.N.Y. 2010) ("If the ALJ is not able to fully credit a treating physician's opinion because the medical records from the physician are incomplete or do not contain detailed support for the opinions expressed, the ALJ is obligated to request such missing information from the physician." (citing Perez, 77 F.3d at 47)).

III.    DISCUSSION

The ALJ correctly conducted the five-step analysis required by 20 C.F.R.

§§ 404.1520 and 416.920.  The ALJ's determinations at steps one through three are

not challenged.

A.      Residual Functional Capacity

Plaintiff argues that the ALJ did not properly evaluate the medical evidence

as to his RFC at step four.[8]  In particular, he argues that the ALJ did not give

sufficient weight to the opinion of plaintiff's psychiatrist Dr. Ewaskio under the

treating physician rule and that he did not sufficiently credit plaintiff's own hearing

testimony. The Court disagrees.

1.      Treating Physician's Opinion

In giving limited weight to Dr. Ewaskio's low RFC assessment for plaintiff—

that he is unable to work for at least twelve months—the ALJ properly considered

the factors in 20 C.F.R. § 404.1527 and gave an explicit rationale.  See Halloran,

362 F.3d at 32.  The ALJ recognized that Dr. Ewaskio is a specialist in psychiatry

and plaintiff's treating physician.  He acknowledged frequency, length, and nature

of the treatment history.  (Tr. 26.)  He specifically cited to Dr. Ewaskio's reports

from six separate occasions from 2008 to 2011.  (Tr. 26-27.)

Most importantly, the ALJ found that substantial evidence in the record,

such as "treatment records, including periodic mental status exams and Assessment

and Plans, simply do not support [Dr. Ewaskio's] sweeping limitations for this

claimant."  (Tr. 26.)  The ALJ gave several bases for his determination.

---

[8]      All subsequent references to "ALJ" refers to ALJ Friedman.

First, the ALJ noted the lack of consistent treatment notes from Dr. Ewaskio that support the opinion plaintiff is unable to work.  On the contrary, the ALJ explained, Dr. Ewaskio's own treatment notes indicate that plaintiff exhibited a number of qualities that demonstrate ability to perform sedentary work, such as adequate memory, attention, judgment, insight, and impulse control.  He was able to understand, remember, and carry out simple job instructions.  (Tr. 26.)  In addition, plaintiff also always had GAF assessments between 55 and 60, which are consistent with moderate symptoms.[9]  (Tr. 26.)

Second, the ALJ found that Dr. Ewaskio's notes over the two-year period when she treated plaintiff are "virtually identical in their diagnoses, descriptions of symptoms, and of claimant's limitations, assessing h[i]m as disabled," despite her acknowledgment that plaintiff was improving with treatment.  For example, despite finding that plaintiff's symptoms had diminished and stabilized in January 2011 again in June 2011, Dr. Ewaskio nevertheless states in a July 2011 letter that her assessments in the May 20, 2010 psychiatric impairment questionnaire remained "accurate and valid" and that plaintiff's symptoms "impair his ability to function efficiently and effectively in work environments."  (Tr. 27, 825.)

---

[9]     Plaintiff argues that the Commissioner's rules discounts the GAF because it does not have a "direct correlation to the severity requirements."  However, the Commissioner's response to commentary on a proposed rule that plaintiff cites does not at all preclude the ALJ from considering GAF measures in the medical evidence; rather, it states that GAF numbers do not have a "direct correlation to the severity requirements in our mental disorder listings," referring to Appendix 1 listing of impairments, which is not at issue in this action.  Indeed, it states that a claimant's medical sources can "routinely observe and make judgments about an individual's functional abilities and limitations," including via the GAF.  See 65 Fed. Reg. 50746, 50764-45 (2000) (responses to comments of final rule codified at 20 C.F.R. pts. 404, 416.)  Similarly, plaintiff's suggestion that the American Psychiatric Association's decision to drop the GAF scale as a diagnostic tool from the latest version of the DSM is relevant to the ALJ's decision in 2011 is without merit.

Third, the ALJ found that Dr. Ewaskio's opinions were inconsistent with the treatment notes from the LMSW Keeler, who saw plaintiff more frequently as his therapist under Dr. Ewaskio's supervision than Dr. Ewaskio did.  Keeler's notes indicate that plaintiff was always calm, clinically stable, adherent to his medication regimen, and open in discussing triggers of stress and grief, and motivated towards managing his symptoms.  (Tr. 27.)  Later notes from Keeler indicated that plaintiff's condition was stable and that there was some improvement.  (Tr. 28.)  The ALJ concluded that nothing in Keeler's records, "which document direct and continual contact . . . is there any object[ive] support at all for her [Dr. Ewaskio's] assessments of marked, drastic symptoms and functional limitations," or "worsening in the claimant's level of symptoms and functioning."  (Tr. 28.)

Although the opinion of social workers are not governed by the treating physician rule, treatment information from social workers and therapists may be used to "provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  Soc. Sec. Ruling 06-3p., 71 Fed. Reg. 45593 (S.S.A. Aug, 9, 2006);[10] see also Canales v. Comm'r Soc. Sec., 698 F. Supp. 2d 335, 344 (E.D.N.Y. 2010).  Here, the ALJ is not using Keeler's treatment notes as controlling evidence under the treating physician rule.  Rather, he considers the evidence as a part of the record in evaluating whether Dr. Ewaskio's notes are supported by substantial evidence, and concluded that they are not.

---

[10]     In addition to federal regulations, ALJs must also follow Social Security Rulings, which are issued by the Commissioner and contain "precedential decisions" relating to claims for disability benefits.  Social Security Rulings "are binding on all components of the Social Security Administration. These rulings represent precedent final opinions and orders and statements of policy and interpretations" adopted by the SSA.  20 C.F.R. § 402.35.

Because the ALJ considered each of the required factors under 20 C.F.R. § 404.1527(d)(2), and set forth specific reasons in the record evidence for not assigning Dr. Ewaskio's opinions controlling weight, his determination was based upon substantial evidence.  See Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983) ("The opinion of a treating physician is not binding if it is contradicted by substantial evidence.").  Thus, the ALJ appropriately assessed that plaintiff had the RFC "to perform sedentary work as defined in 20 CFR 416.967(a) limited to low-stress, simple tasks involving only minimal contact with coworkers and the public." (Tr. 22.)

### 2.   Consultative Examiner's Opinion

In determining plaintiff's RFC, the ALJ assigned the opinion of the psychiatric consultative evaluator, Dr. Alexander, partial weight.  Plaintiff was evaluated only once by Dr. Alexander, who performed a mental status evaluation in June 2008 and diagnosed plaintiff with dysthymic disorder and substance abuse issue in remission.

Plaintiff argues that the ALJ should have contacted Dr. Alexander for more clarification after determining that parts of his opinion are contradictory and inconsistent.  This argument is meritless, because the ALJ properly evaluated the one-time examining consultant's examination and assigned weight to the portions of the evidence based on the consultant's clinical evaluation, which were also supported by the rest of the record.  (Tr. 25.)  The ALJ gave weight to the part of Dr. Alexander's findings based on plaintiff's abilities to "engage in a wide range of work-

related activities," which were based on detailed findings pursuant to the mental status evaluation. These findings include plaintiff's ability to follow directions, perform task independently, deal with stress, and manage self-care activities.

The ALJ did not give weight to Dr. Alexander's finding that plaintiff cannot manage his own funds due to his alcohol and drug history, since Dr. Alexander cited no basis for this determination, and plaintiff's substance abuse had been in remission as evidenced by the totality of the record—which extended well beyond June 2008. He also did not give weight to Dr. Alexander's finding that plaintiff would have difficulty working because of his psychiatric condition, because the results of the clinical evaluation and other substantial evidence contradicted this conclusion. (Tr. 25.) The ALJ's decision not to seek further clarification on this issue from Dr. Alexander is not erroneous, since—as plaintiff himself acknowledges—the opinions of one-time consultative non-treating physicians should not be afforded weight. See Selian v. Astrue, 708 F.3d 409, 419 (2d Cir. 2013).[11]

### 3.   Plaintiff's Hearing Testimony

Plaintiff also argues that the ALJ erred in determining that plaintiff's hearing testimony was only partially credible. The Court disagrees.

The ALJ, "after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility . . . may decide to discredit the claimant's subjective estimation of the degree of impairment." Tejada, 167 F.3d at 776

---

[11]   Moreover, the opinion of a second psychiatric consultant, Dr. Altmansberger, contradicted that of Dr. Alexander. Dr. Altmansberger evaluated plaintiff a month after Dr. Alexander, and found that plaintiff can learn and perform simple tasks, maintain attention, and deal with stress, despite having difficulty dealing with others. Dr. Altmansberger concluded that plaintiff can perform simple jobs. (Tr. 423.)

(citation omitted).  As with any finding of fact, "[i]f the Secretary's findings are supported by substantial evidence ... the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain."  Perez v. Barnhart, 234 F.Supp.2d 336, 341 (S.D.N.Y. 2002) (quoting Aponte, 728 F.2d at 591).  An ALJ's credibility determination is thus entitled to deference, unless it is not set forth "with sufficient specificity to enable [a reviewing court] to decide whether [it] is supported by substantial evidence."  Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984).

Here, the ALJ's determination of plaintiff's credibility is set forth with "sufficient specificity."  Id.  The ALJ credited plaintiff's testimony as to his physical limitations—namely, his lower back and leg pain.  (Tr. 24.)  He also considered plaintiff's testimony as to his difficulty concentrating, anxiety around being others, and the worsening of symptoms upon the death of his wife.  The ALJ credited plaintiff's testimony that he is able to sit for prolonged periods of time, perform activities of daily living, and "read and watch television despite his alleged concentration difficulties."  (Tr. 24.)

However, based on his view of the entire record, the ALJ concluded that plaintiff's subjective statements regarding his ability to work were "partially credible," and that the statements were not credible "to the extent of precluding him from performing all types of substantial gainful work activity."  (Tr. 24 (emphasis added).)  For that reason, the ALJ found that plaintiff could perform sedentary work with additional limitations, including minimal contact with others.  (Tr. 24.)

The ALJ also found that when plaintiff kept his mental health treatment appointments regularly, "his symptoms were stable and he was doing quite well." (Tr. 27.)  A plaintiff's subjective statements "may be less credible if the level of frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatments as prescribed and there are no good reasons for this failures."   Soc. Sec. Ruling 96-07p, 1996 WL 374186, at *7 (SSA Jul. 2, 1996).  Although plaintiff suggests that individuals with mental illnesses may lack rationality to decide when to pursue treatment, there is no evidence on the record that this was true plaintiff.  In fact, the record is replete with documentation that plaintiff was motivated for treatment.

Thus, the ALJ's RFC analysis considered the objective medical evidence along with other indicia of the plaintiff's reliability, and thus the Court must defer to his determination to discount plaintiff's "subjective complaints."  Perez, 234 F. Supp. 2d at 341 (quoting Aponte, 728 F.2d at 591).  Accordingly, the ALJ's credibility determination must be upheld.

B.   Vocational Expert Testimony

At step five, the ALJ, after considering the testimony of vocational expert Victor Alberigi, properly concluded that based on the Medical-Vocational Guidelines, there were jobs in the national economy for an individual with plaintiff's age, education, work experience, and RFC.  (Tr. 30.)

Plaintiff's argues that the vocational expert's opinion as based on faulty assumptions because the VE's conclusion was based on the ALJ's step four findings

of plaintiff's RFC.  This argument is without merit.  For the reasons stated above, the ALJ's RFC determinations—that plaintiff "was capable of sedentary work of a low stress simple nature involving minimal contact with co-workers and the public"—are supported by substantial evidence and therefore a proper basis for the VE's determination.  See Calabrese v. Astrue, 358 F. App'x 274, 276 (2d Cir. 2009).  Thus, "the ALJ rightfully removed that issue from the vocational expert's consideration. The vocational expert is just that, a vocational expert. The ALJ is responsible for determining, based on all the evidence, the claimant's physical capabilities." Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir. 1983).

Plaintiff also argues that the ALJ should have recited to the VE his step three findings as to plaintiff's moderate difficulties in social functioning and in concentration, persistence, and pace.  However, the Second Circuit has held that failure to include the limitation in concentration, persistence, and pace in the hypothetical to the VE is harmless error if medical evidence shows that plaintiff (1) "can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence and pace, and the challenged hypothetical is limited to include only unskilled work; or (2) if the hypothetical otherwise implicitly accounted for claimant's limitations" in that area.  McIntyre v. Colvin, 758 F.3d 146, 152 (2d Cir. 2014).  Here, the evidence does show that plaintiff can engage in simple, unskilled tasks and that the ALJ limited his hypothetical to unskilled work.  (Tr. 879.)  The jobs that the vocational expert discussed were all unskilled positions.  Furthermore, the ALJ clearly limited his hypothetical to only jobs that involve

"minimal contact with co-workers and the public," hence specifically accounting for plaintiff's limitations in social functioning.  (Tr. 879.)  Thus, the testimony of the vocational expert was proper and the ALJ did not err in relying on it to reach his conclusion at step five.

IV.  CONCLUSION

For these reasons, defendant's motion for judgment on the pleadings is GRANTED and plaintiff's motion for judgment on the pleadings is DENIED.  The Clerk of Court is directed to terminate the motions at ECF Nos. 10 and 18, to enter judgment for defendant, and to terminate this action.

SO ORDERED.

Dated:      New York, New York
            December 17, 2015

_____
KATHERINE B. FORREST
United States District Judge